UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUAN J. CORTES,                                    :

                  Plaintiff,          :          13 Civ. 9098 (AJP)

             -against-             :          **OPINION AND ORDER**

CAROLYN W. COLVIN, Commissioner of                 :
Social Security,
                                  :
               Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

                    Plaintiff Juan Cortes, represented by counsel (the Urban Justice Center), brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying him Social Security disability insurance benefits ("DIB").  (Dkt. No. 2: Compl.)  Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 9: Cortes Motion for Judgment on the Pleadings; Dkt. No. 21: Gov't Motion for Judgment on the Pleadings.)  The Commissioner concedes that remand is necessary, while Cortes seeks remand for the calculation of benefits.  (See page 12 below.)  The parties have consented to decision of the case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 20: Consent Form.)

                    For the reasons set forth below, the Commissioner's motion (Dkt. No. 21) is DENIED and Cortes' motion (Dkt. No. 9) is GRANTED and the case remanded to the Commissioner for the calculation of benefits.

## FACTS

### Prior Proceedings

In August or September 2005, Cortes applied for DIB benefits, alleging that he became disabled as of October 1, 1999.  (R. 50, 58, 670.)[1/]  On October 3, 2007, Cortes appeared at a hearing before ALJ Paul A. Heyman.  (R. 429-63.)  On November 13, 2007, ALJ Heyman denied Cortes' claim.  (R. 11-24.)  On February 6, 2008, the Appeals Council denied Cortes' request for review.  (R. 4-6.)  Cortes sought judicial review, and on September 4, 2008, the Court vacated the Appeals Council's decision pursuant to a stipulation between the parties and remanded for further proceedings. (R. 517-19.)

On May 13, 2009, ALJ Heyman held a second hearing (R. 630-56) and on July 24, 2009 again denied Cortes' claim (R. 468-79).  On January 22, 2011, the Appeals Council denied Cortes' second request for review.  (R. 464-66.)  Cortes again appealed, and on November 21, 2011, the Court again remanded the matter to the Appeals Council for further proceedings pursuant to a stipulation between the parties.  (R. 671-72.)  On March 28, 2012, the Appeals Council remanded Cortes' application to an ALJ for a further hearing  (R. 674-79.)

On January 11, 2013, Cortes appeared at a hearing before ALJ Moises Penalver (R. 873-934), who denied Cortes' application on August 29, 2013 (R. 657-70).  The Appeals Council chose not to review the ALJ's decision, and Cortes appealed to the Court for the third time.  (See Cortes Br. at 3; Gov't Br. at 2.)

_____

[1/]    The record contains contradictory information about the exact date of Cortes' DIB application.  (See Dkt. No. 10: Cortes Br. at 1 n.1.)  Cortes also filed an application for supplemental security income, which was denied on technical grounds and is not at issue in this case.  (See Dkt. No. 22: Gov't Br. at 1 n.2.)

**Non-Medical Evidence**

Cortes, born on January 8, 1964 (R. 490),  completed the sixth grade in Honduras (R. 97).  Cortes was last employed as a building superintendent from January 1995 until October 1, 1999.  (R. 84.)  His duties included maintaining the building's boiler and plumbing, and making repairs to apartments.  (R. 92.)  He sometimes lifted and carried 100 pounds or more and frequently lifted fifty pounds or more.  (R. 85, 101.)

An October 4, 2005 adult function report for the New York State Office of Temporary and Disability Assistance described Cortes' degree of independence in activities of daily living.  (R. 73-83.)  Cortes could do many personal care activities, including brushing his teeth, showering and shaving, but stated that "I cannot lift (L) arm to comb my hair."  (R. 74-75.)  He reported that bathing takes "more time" because his left arm is totally immobile and claimed that he was not able to "lift any heavy objects."  (R. 74.)  Cortes did not prepare his own meals or cook. (R. 74-75.)  He could, however, wash his own clothes using his right arm.  (R. 76.)  He visited his pastor's home weekly and sang in church.  (R. 74, 77.)  Cortes stated that he could walk four blocks before needing to rest for ten minutes due to back pain.  (R. 79.)

**Medical Evidence**

On October 1, 1999, Cortes fell down stairs while working and fractured his left shoulder.  (R. 147, 172.)  In 1999 or 2000, he had reconstructive surgery to repair his fractured left shoulder.  (R. 140, 147.)

A May 31, 2002 MRI of Cortes' thoracic spine showed "posterior disc bulging beyond the vertebral margins."  (R. 118.)  A cervical spine MRI on the same day showed "[t]he C2-

C3 through C4-C5 disc annuli[2] are bulging posteriorly beyond the vertebral margins" and "straightening of the cervical lordosis[3] compatible with muscle spasm." (R 119.)

On June 19, 2002, a physician was unable to examine Cortes' shoulder fully because of severe pain. (R. 161.) Cortes was diagnosed with RSD[4] in his left upper extremity and a possible rotator cuff tear. (R. 161.)

On August 5, 2002, Dr. Ian Cole examined Cortes. (R. 160.) Dr. Cole found that Cortes' left shoulder abduction and flexion were 0-5 degrees, and his extension was 0 degrees. (R. 160.) Cortes' strength was limited by severe pain. (Id.) On September 10, 2002, Dr. Cole found that Cortes' left shoulder had zero to ten degrees of abduction and flexion but that Cortes also had diffuse tenderness and atrophied biceps and triceps. (R. 159.)

On October 22, 2002, Dr. Harvey Insler diagnosed Cortes with reflex sympathetic dystrophy of the left shoulder. (R. 158.) On December 9, 2002, Cortes complained to Dr. Insler of numbness and paresthesia[5] in his left arm and hand. (R. 157.) Nerve conduction velocity studies for Cortes from December 2002 were normal (R. 153-55), as were EMG studies in January 2003 (R.

---

[2]   "Annuli" means ring or ringlike structures. Dorland's Illustrated Medical Dictionary at 94 (32d ed. 2012).

[3]   "Lordosis" refers to a concave portion of the vertebral column as seen from the side. Dorland's Illustrated Medical Dictionary at 1074.

[4]   "Reflex sympathetic dystrophy" syndrome is a type of complex regional pain syndrome that often follows tissue injury but without demonstrable nerve injury. Dorland's Illustrated Medical Dictionary at 585, 1826. When limited to the upper extremity, is it also called "shoulder-hand" syndrome. Id. at 1826. It is characterized by intense burning pain, changes in skin color and texture, increased skin temperature and sensitivity. Id.

[5]   "Paresthesia" refers to an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus. Dorland's Illustrated Medical Dictionary at 1383.

149-51).

A March 22, 2004 x-ray of Cortes' shoulder showed "[n]o gross evidence of fracture or dislocation or any other bony pathology."  (R. 199.)  A June 16, 2004 examination at Jacobi Medical Center's Orthopedic Clinic found global weakness in Cortes' left shoulder and fingers, as well as contraction of his elbow and fingers on his left side.  (R. 211-13.)  A June 21, 2004 x-ray of Cortes' left shoulder showed "no evidence of an acute fracture or dislocation."  (R. 176.)

On July 16, 2004, Cortes was diagnosed with "Adhesive Capsulitis/RSD"[6/] and scheduled for physical therapy three times a week for six to eight weeks at Columbia Presbyterian Medical Center.  (R. 165.)  A September 1, 2004 note from Columbia Presbyterian stated that Cortes complained that his pain was "10/10" and "reports no relief of pain even [with] meds."  (R. 169.)

On December 10, 2004, Dr. Leena Mathew of New York Presbyterian's Pain Management Center evaluated Cortes, who was "extremely tearful throughout the entire encounter." (R. 237.)  Dr. Mathew observed that Cortes "walks cradling his left elbow with his right hand," "does not swing his left arm as he walks," "has not used his arm in over a year prior to this visit because of the pain," and "holds his arm in a very guarded manner with his right arm." (R. 237-38.) When she abducted Cortes' shoulder, he reported that his pain was "around 9/10." (R. 237.)  Dr. Mathew found that Cortes "had pain with any degree of motion." (R. 238.)  Dr. Mathew opined that Cortes had "progressive shoulder pain, most probably secondary to adhesive capsulitis.  He is s/p rotator cuff tear and repair."  (Id.)

Progress notes from the Walton Family Health Center in September and October

---

[6/]   "Adhesive capsulitis" is an adhesive inflammation between the joint capsule and the peripheral articular cartilage of the shoulder, characterized by shoulder pain of gradual onset, increasing pain, stiffness, and limitation of motion.  Dorland's Illustrated Medical Dictionary at 286.  Also known as "adhesive bursitis" and "frozen shoulder."  Id.

2005 state that Cortes had a depressed mood and constricted affect. (R. 376-79).  Cortes was diagnosed with acute stress reaction and organic mood disorder.  (R. 377.)  Treatment notes from Dr. Gabriela Bermudez show that on December 13, 2005, Cortes complained of depression and reported having been on Zoloft several years previously.  (R. 363.)  Dr. Bermudez prescribed Zoloft and follow-up with a social worker.  (R. 364.)

On March 19, 2006, Dr. Bermudez completed a medical source statement assessing Cortes' limitations based on his medical history and other records.  (R. 240-43.)  Dr. Bermudez opined that Cortes could not carry any weight with his left arm.  (R. 240.)  Dr. Bermudez stated that Cortes had no standing, walking or sitting limitations, but his pushing and pulling was affected by his impairments.  (R. 240-41.)  Dr. Bermudez specifically noted that Cortes "cannot use" his left upper extremity.  (R. 241.)  The clinical findings supporting Dr. Bermudez's conclusions were that Cortes had left reflex sympathetic dystrophy and could not extend or flex his left shoulder/arm.  (Id.)  Cortes could never climb ramps, stairs, ladders, ropes or scaffolds.  (Id.)  Cortes' reaching, handling, fingering and feeling all were limited because Cortes could not do them with his left arm.  (R. 242.)  Finally, Cortes had environmental limitations with respect to temperature extremes, humidity/wetness, hazards, and fumes, odors, chemicals and gases.  (R. 243.)

On September 19, 2007, Dr. Sarah Nosal of the Urban Horizons Family Practice completed a residual functional capacity questionnaire on Cortes.  (R. 252-55.)  Dr. Nosal diagnosed Cortes with rotator cuff syndrome and identified his symptoms as pain, stiffness, swelling and limited mobility.  (R. 252.)  Dr. Nosal observed that Cortes had joint deformity, reduced grip strength, sensory changes, reflex changes, abnormal posture and muscle weakness.  (Id.)  She opined that Cortes could sit for about two hours out of an eight hour workday and stand for less than two. (R. 253.)

On April 29, 2009, Dr. Joseph DiLullo of the Institute for Family Health completed a residual functional capacity questionnaire on Cortes. (R. 550-54.) Dr. DiLullo had been treating Cortes since June 2006, and he diagnosed Cortes with "maj[.] depressive disorder, recurrent, severe." (R. 550.) He opined that Cortes' prognosis was fair to poor because Cortes had lost his livelihood and felt useless and helpless. (Id.) Dr. DiLullo opined that Cortes had severe deficiencies in his concentration, persistence or pace; marked difficulties in maintaining social functioning; moderate restriction in activities of daily living; and one or two episodes of decompensation, each of at least two weeks' duration, in the prior year. (R. 551.) Dr. DiLullo found Cortes seriously limited in his ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. (R. 552.) Cortes had no useful ability to complete a normal workday and workweek without interruptions from psychologically based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.) Dr. DiLullo found Cortes too limited to meet competitive standards with respect to a wide range of additional mental abilities necessary for work activities. (Id.) Dr. DiLullo opined that Cortes had a medically documented history of a chronic affective disorder of at least two years' duration and a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate. (R. 553.) Finally, Dr. DiLullo stated that Cortes would be absent from work more than four days per month. (Id.)

On May 12, 2009, Dr. Adam Szerenesy of the Urban Horizons Family Practice completed a medical source statement for Cortes. (R. 555-58.) Dr. Szerenesy observed that Cortes was unable to move his left arm and diagnosed Cortes with "frozen shoulder" and possible RSD. (R. 555.) He found that Cortes had tenderness, reduced grip strength, muscle spasm, muscle

weakness and muscle atrophy in his left arm.  (Id.)  According to Dr. Szerenesy, Cortes could sit for

at least six hours out of an eight hour workday and stand for less than two hours.  (R. 556.)  He

opined that Cortes could never lift or carry with his left arm.  (R. 557.)  Similarly, Cortes could only

occasionally twist, stoop, crouch or climb stairs and never climb ladders.  (Id.)  Dr. Szerenesy found

that Cortes could not use his left hand, fingers and arm for grasping, twisting, and turning of objects,

fine manipulation, and reaching.  (Id.)  Dr. Szerenesy opined that Cortes' depression and anxiety

contributed to the severity of Cortes' symptoms.  (R. 558.)

**Expert Testimony**

**Dr. Arthur Lorber**

Orthopedist Dr. Arthur Lorber testified at Cortes' hearing before ALJ Penalver.  (R.

902-12.)  After reviewing the medical evidence in the record (R. 902-08), Dr. Lorber testifed that

Cortes had the ability to do limited light work, occasionally could lift twenty pounds and frequently

could lift ten pounds, primarily with his right hand (R. 909-10).  Dr. Lorber testified that Cortes

"could perform no overhead work with his left upper extremity.  In fact, he could perform no

reaching whatsoever with his left upper extremity, however he could perform handling and fine

fingering activities with his left upper extremity, and feeling."  (R. 909)  ALJ Penalver asked Dr.

Lorber: "No overhead reaching or no reaching at all with the left upper extremity. . . . Did I miss

something?"  (R. 910.)  Dr. Lorber replied "[n]o, you did not."  (Id.)

**Vocational Expert Raymond Cestar**

ALJ Penalver heard testimony from vocational expert Raymond Cestar.  (R. 920-26.)

In response to a question from the ALJ about a hypothetical individual of Cortes' age, education, and

work experience who could perform light work but "can never push or pull using the left upper

extremity, the non-dominant left upper extremity, no pushing or pulling, can never climb ladders,

ropes, or scaffolds, and can never crawl," "can never reach and can never perform overhead reaching" and is "limited to simple, routine tasks" that avoid concentrated exposure to excessive noise and vibration, Cestar testified that "I'm going to say I couldn't cite any jobs." (R. 921-22.) Cestar went on to testify "[INAUDIBLE] play with is a school bus monitor, but all these other jobs do require bilateral use of the arms, you know, the reaching in front of the body. That would be the only job I would be comfortable citing, judge." (R. 922.)

ALJ Penalver noted the statement in the regulations that sedentary jobs usually require bilateral use of the hands and asked if the requirement extended to light work. (R. 923.) Cestar agreed that sedentary work requires the use of both hands, and testified that "these other jobs that I would cite do require reaching in front of their body." (Id.)

ALJ Penalver asked a variant of his hypothetical, removing the restriction on no reaching at all with the left upper extremity but leaving the limitation of no reaching overhead in place. (R. 924.) Cestar identified three occupations that exist in substantial numbers in the economy that the hypothetical individual could do: cafeteria attendant, photocopying-machine operator, and laundry folder. (Id.) Cestar told ALJ Penalver that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and its companion, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"). (R. 924.)

**ALJ Penalver's Decision**

On August 29, 2013, ALJ Penalver issued his written decision finding Cortes not disabled. (R. 657-70.) At the first step of the five-step sequential analysis, ALJ Penalver found that Cortes "did not engage in substantial gainful activity during the period from his alleged onset date of October 1, 1999 through his date last insured of December 31, 2004." (R. 666.) At the second step, ALJ Penalver found that "[t]hrough the date last insured, [Cortes] had the following severe

impairments: right ear hearing loss, left upper extremity disorder, and disc bulging." (Id.)  ALJ

Penalver also found that:

> [T]here is no evidence of sustained mental/psychiatric impairment prior to the date
> last insured.  The evidence of record shows the development of mental impairments
> and limitations well after the date last insured.  However, there were no psychiatric
> diagnoses, nor signs, symptoms or limitations in any mental area prior thereto.

(Id.)

At step three, ALJ Penalver found that through the date last insured, Cortes "did not

have an impairment or combination of impairments that met or medically equaled the severity of

one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (R. 666.)  According

to ALJ Penalver, a "review of the available record reveals no evidence to support a conclusion that

[Cortes'] impairments meet or medically equal any applicable Listing, including 1.02 Major

dysfunction of a join, [and] 1.04 Disorders of the spine."  (R. 666.)

ALJ Penalver next determined that Cortes had the residual functional capacity

("RFC") to:

> [P]erform light work, as defined in 20 CFR 404.1567(b), except that he can never
> push or pull with his left upper extremity; never climb ladders, ropes, or scaffolds;
> never crawl; and never perform overhead reaching with his left upper extremity. He
> must also avoid concentrated exposure to excessive noise or vibration.  Finally, work
> must be limited to simple, routine tasks.

(R. 666.)  In determining Cortes' RFC, ALJ Penalver "considered all symptoms and the extent to

which these can reasonably be accepted as consistent with the objective medical evidence and other

evidence."  (Id.)  He also "considered opinion evidence in accordance with the requirements of 20

CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p."  (R. 666.)

ALJ Penalver discussed Cortes' hearing testimony and the medical evidence in the

record, including the evidence of Cortes' treatment and the diagnostic imaging of his back and left

shoulder.  (R. 667.)  ALJ Penalver found Cortes "partially credible," stating:

> Although the application for disability is based on his alleged inability to perform work related activities, [Cortes] indicated at around the time of application that he did perform his personal care activities, drive a car, wash clothing, and participate in church activities.  Such inconsistency and selectivity suggests that [Cortes'] symptoms are not as severe as he alleges.

(Id., record citation omitted.)

ALJ Penalver found that Dr. Mathew's December 2004 opinion was entitled to "some weight" because "she was one of [Cortes'] treating physicians and because her evaluation took place on a date close to [Cortes'] date last insured."  (R. 668.)  ALJ Penalver discussed Dr. Mathew's findings in detail, noting her examination results.  (Id.)

ALJ Penalver gave "[l]ittle weight" to Dr. Bermudez's opinion because Dr. Bermudez "did not examine [Cortes] in person during the period in question and . . . offered an opinion that was over a year after [Cortes'] December 2004 date last insured."  (Id.)  ALJ Penalver did not discuss the medical source statements from Dr. Nosal, Dr. DiLullo and Dr. Szerenesy.  (See R. 666-68.)

At step four, ALJ Penalver found that "[t]hrough the date last insured, [Cortes] was unable to perform any past relevant work."  (R. 668.)  ALJ Penalver based his conclusion on the vocational expert's testimony and that Cortes' "past relevant work requires a level of exertion that exceeds the maximum allowance of the light level of exertion as defined in the residual functional capacity."  (Id.)  ALJ Penalver found that Cortes "is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English."  (R. 669.)

Finally, at step five, ALJ Penalver found that "[t]hrough the date last insured, considering [Cortes'] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Cortes] could have

performed." (Id.)  ALJ Penalver observed that "if [Cortes] had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.18." (R. 669.)  Because Cortes' "ability to perform all or substantially all of the requirements of this level of work was impeded by additional limitations," ALJ Penalver instead relied upon the vocational expert's testimony. (Id.)  ALJ Penalver stated that when he "asked the vocational expert whether jobs existed in the national economy for an individual with [Cortes'] age, education, work experience, and residual functional capacity," the vocational expert testified that such an individual would have been able to perform the requirements of cafeteria attendant, photocopy machine operator and laundry folder. (Id.)  ALJ Penalver "determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. 670.)  ALJ Penalver therefore found that Cortes "was not under a disability, as defined in the Social Security Act, at any time from October 1, 1999, the alleged onset date, through December 31, 2004, the date last insured." (Id.)

**Cortes' Current Lawsuit**

Before this Court, both Cortes and the Commissioner seek remand under sentence four of 42 U.S.C. § 405(g), which provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). (See Dkt. No. 10: Cortes Br. at 16-17; Dkt. No. 22: Gov't Br. at 2-6.)  Cortes, however, seeks remand for the calculation and award of benefits. (Cortes Br. at 1; Dkt. No. 23: Cortes Reply Br. at 2.)

Cortes argues that "[t]he Commissioner failed to meet her burden of proving that Cortes' residual functional capacity enabled him to engage in other employment in the national

economy" because the three occupations that ALJ Penalver identified were based on vocational expert testimony in response to a hypothetical involving an RFC with fewer limitations than ALJ Penalver found for Cortes.  (Cortes Br. at 14-15.)  According to Cortes, ALJ Penalver "accepted the testimony of Dr. Lorber, his own medical expert, that Cortes could perform no reaching whatsoever with his upper left extremity," and when questioned about a hypothetical individual of Cortes' age, education, and work experience who could not push or pull with his upper left extremity, the vocational expert "was unable to offer the ALJ any jobs."  (Cortes Br. at 15.)  Thus, the ALJ's "conclusion that Cortes had the ability to engage in the three occupations Cestar offered is inconsistent [with the ALJ's RFC determination] and not based on substantial evidence."  (Cortes Br. at 15-16.)  "Cortes has no quarrel with the RFC the ALJ found for him."  (Cortes Reply Br. at 7.)

        The Commissioner faults ALJ Penalver's decision because "the ALJ did not properly evaluate the evidence of record in deciding [Cortes'] claim" and because "the ALJ's step 5 finding did not reconcile the apparent conflicts between the vocational expert testimony and the information contained in" the DOT.  (Gov't Br. at 4-5.)  The Commissioner further argues that until the medical evidence is properly weighed, "it is also not clear whether substantial evidence supports the ALJ's finding that [Cortes'] statements concerning the intensity, duration and limiting effects of his symptoms were partially credible."  (Gov't Br. at 5.)  Finally, the Commissioner argues that remand for the calculation of benefits is inappropriate because "the record contains evidence showing that [Cortes] was not completely disabled, i.e., that he could at least perform sedentary work."  (Gov't Br. at 6; see also id. at 8.)

# ANALYSIS

## I.    THE APPLICABLE LAW

### A.    Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[7/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388

---

[7/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472.[8/]

        In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[9/]

### B.    <u>Standard Of Review</u>

        A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. <u>E.g.</u>, 42 U.S.C. § 405(g); <u>Giunta</u> v. <u>Comm'r of Soc. Sec.</u>, 440 F. App'x 53, 53 (2d Cir. 2011).[10/] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

---

[8/]    <u>See also</u>, <u>e.g.</u>, <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

[9/]    <u>See</u>, <u>e.g.</u>, <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62.

[10/]    <u>See also</u>, <u>e.g.</u>, <u>Prince</u> v. <u>Astrue</u>, 514 F. App'x 18, 19 (2d Cir. 2013); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 551 U.S. 1132, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[11/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[12/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[13/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[11/]  See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[12/]  See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[13/]  See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[14/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[14/]   See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training.  See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[15/]

## II.     APPLICATION TO CORTES' CLAIMS

### A.     ALJ Penalver Failed To Evaluate Evidence In Determining Cortes' RFC And Credibility

ALJ Penalver failed to evaluate and weigh several pieces of opinion evidence in

determining Cortes' RFC at step three.  Although ALJ Penalver wrote that he "considered opinion

evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p

and 06-3p," he only discussed the weight he gave to the opinions of two of Cortes' doctors, Dr.

Mathew and Dr. Bermudez.   (See R. 666-68; page 10 above.)   ALJ Penalver provided no

explanation for why he rejected or ignored the testimony of his own medical expert, Dr. Lorber, that

Cortes "could perform no reaching whatsoever with his left upper extremity." (See R. 666-68; page

8 above.)   Indeed, the Commissioner concedes that the ALJ "failed to evaluate and weigh the

opinion evidence in the record, including the January 2013 hearing testimony by medical expert

Arthur Lorber, M.D."  (Dkt. No. 22: Gov't Br. at 4.)  Moreover, ALJ Penalver did not explain how

he determined that Cortes' RFC should include a limit only on overhead reaching with his left arm

as opposed to all reaching with the left arm.  (See R. 666-68.)  Dr. Mathew's report, to which ALJ

Penalver gave some weight, does not opine that Cortes could reach with his left arm.  (See R. 237-

39; page 11 above.)  Dr. Mathew's report stated that Cortes "walks cradling his left elbow with his

right hand," "does not swing his left arm as he walks," and "has not used his arm in over a year prior

---

[15/]     See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F.
App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003);
Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675
F.2d at 467.

to this visit because of the pain." (See page 5 above.)  Those observations are consistent with Dr. Lorber's testimony that Cortes can perform no reaching whatsoever with his left arm (see page 8 above) and with the opinion of Dr. Bermudez to which ALJ Penalver gave little weight (see pages 6, 11 above).

Similarly, as the Commissioner also concedes (Gov't Br. at 4), ALJ Penalver did not evaluate and weigh the opinion evidence in the medical source statements from treating physicians Dr. Nosal, Dr. DiLullo and Dr. Szerenesy.  (See R. 666-68.)  The opinions of Dr. Nosal and Dr. Szerenesy both pertain to Cortes' limitations in using his left arm.  (See pages 6-8 above.)[16/]  Dr. Szerenesy's opinion, in particular, suggests that Cortes has limitations significantly more severe than those reflected in ALJ Penalver's RFC determination (see pages 7-8 above) and is entirely consistent with the findings of Dr. Bermudez (see page 6 above).

Finally, the Commissioner concedes that in light of ALJ Penalver's errors, "it is also not clear whether substantial evidence supports the ALJ's finding that [Cortes'] statements concerning the intensity, duration and limiting effects of his symptoms were partially credible." (Gov't Br. at 5.)  The Court agrees.  Had ALJ Penalver more thoroughly evaluated and weighed the opinions of Cortes' doctors and the Commissioner's own medical expert, he might well have found Cortes more credible than he did in his August 2013 decision.[17/]

_____

[16/]    ALJ Penalver may have disregarded Dr. DiLullo's opinion because it pertained solely to Cortes' alleged mental impairments, which the ALJ found were not severe.  (See pages 7, 10 above.)

[17/]    The Commissioner also concedes that ALJ Penalver erred in stating that there is no evidence of sustained mental impairment prior to the date late insured.  (Gov't Br. at 4.)  The evidence cited by the Commissioner -- an October 12, 2005 diagnosis of acute stress reaction and mood disorder and a December 13, 2005 diagnosis of mood disorder and depressive disorder accompanied by a Zoloft prescription -- postdate Cortes' date last insured.  (Gov't Br. at 4; (continued...)

**B.      Cortes Cannot Perform The Jobs Identified In ALJ Penalver's Step Five Determination Because They Require Frequent Reaching And Because He Is Illiterate**

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[18]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid". The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

---

[17]      (...continued)
see pages 5-6 above). The Commissioner correctly notes that in the December 2005 treatment notes, Cortes reported being on Zoloft several years prior. (Gov't Br. at 4; see page 6 above.) Evidence that Cortes' mental impairments were more serious during the period at issue than the ALJ credited them as being would only serve to further persuade the Court that Cortes is disabled and entitled to benefits.

[18]      See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

1996); <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  <u>Vargas</u> v. <u>Astrue</u>, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); <u>see also</u>, <u>e.g.</u>, <u>Travers</u> v. <u>Astrue</u>, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), <u>report & rec. adopted</u>, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); <u>Lomax</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d 402, 410 (2d Cir. 2010) (quoting <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 605); <u>see also</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing <u>Bapp</u> v. <u>Bowen</u>, 802 F.2d at 603, 605-06)); <u>Suarez</u> v. <u>Comm'r of Soc. Sec.</u>, No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting <u>Zabala</u> v. <u>Astrue</u>, 595 F.3d at 411)).

ALJ Penalver relied on vocational expert Cestar's testimony to find that jobs exist in the economy in significant numbers that Cortes could perform.  (See page 12 above.)[19/]  Cestar testified that a hypothetical individual limited to light work with no overhead reaching with his non-dominant left upper extremity, no pushing or pulling with the left upper extremity, no crawling or climbing ladders, and limited to simple, routine tasks that avoid concentrated exposure to excessive noise and vibration could perform several jobs in the national economy: laundry folder, photocopying-machine operator and cafeteria attendant.  (See pages 8-9 above.)  ALJ Penalver relied upon the vocational expert's testimony in reaching his conclusion when he specifically referred to those three jobs in his findings.  (See page 12 above.)

Cortes challenges ALJ Penalver's step five determination that there are jobs that Cortes could perform.  (Dkt. No. 10: Cortes Br. at 14-15.)

ALJ Penalver erred at step five because all three of the occupations  he found Cortes capable of performing -- photocopying-machine operator, laundry folder and cafeteria attendant --

---

[19/]      A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

require the ability to reach and handle frequently.  See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles at 134, 313, 367 (1993).  The SCO defines reaching as "[e]xtending hand(s) and arm(s) in any direction."  Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C, at C-3 (emphasis added).  ALJ Penalver's hypotheticals to Cestar incorporated significant reaching limitations with Cortes' left arm, first from any reaching whatsoever and then from any reaching in an overhead direction.  (See pages 8-9 above.)  Cestar told ALJ Penalver that his testimony that Cortes could perform these jobs was consistent with both the DOT and SCO, and ALJ Penalver asked no follow up questions.  (See R. 924; page 9 above.)  The Commissioner concedes that ALJ Penalver's step five determination is fatally flawed because "the ALJ did not ask the vocational expert to address the apparent discrepancy between the jobs identified by the vocational expert, which required frequent reaching, and the ALJ's RFC determinations, which limited [Cortes] to no overhead reaching with the upper left extremity."  (Dkt. No. 22: Gov't Br. at 5.)

In addition, as the Commissioner also concedes, "the ALJ's step 5 finding did not reconcile the apparent conflicts between the vocational expert testimony" and the DOT because ALJ Penalver did not ask the vocational expert what effect Cortes' illiteracy would have on his ability to perform the three jobs identified, all of which require the ability to read and recognize the meaning of at least 2,500 English words.  (Gov't Br. at 5.)  The Commissioner is correct that ALJ Penalver did not ask Cestar whether Cortes could meet the language requirements of working as a cafeteria attendant, photocopy-machine operator and laundry folder.  (See R. 920-24.)  The DOT defines all three jobs as requiring language development level one, meaning that an individual must be able recognize the meaning of at least 2,500 words, read at a rate of 95-120 words per minute and print simple sentences.  See Dictionary of Occupational Titles at 177, 241, 266-67, 1011 (4th ed.

1991).  Based on those requirements, an illiterate individual such as Cortes could not perform work requiring language level one.  Thus, ALJ Penalver's finding that Cortes could work as a cafeteria attendant, photocopy machine operator or laundry folder is not supported by the vocational expert's testimony.  ALJ Penalver did not ask the vocational expert whether there were any <u>other</u> jobs in the national economy that a hypothetical illiterate individual with Cortes' RFC could perform.  (<u>See</u> R. 920-24.)  Cortes' illiteracy thus disqualified him from performing the only potential jobs identified by the Commissioner at step five appropriate for an individual with the RFC that ALJ Penalver found for Cortes.

Moreover, ALJ Penalver did not question the vocational expert about whether an illiterate hypothetical individual of Cortes' age, education and work experience who is limited to no reaching whatsoever could work as a school bus monitor, the only job cited by the vocational expert for that level of restriction.  (<u>See</u> R. 920-24.)  According to the DOT, however, work as a school bus monitor demands language development level two, which requires a passive vocabulary of 5,000-6,000 words and a reading rate of 190-215 words per minute.  <u>See</u> <u>Dictionary of Occupational Titles</u> at 269, 1011.  Thus, if ALJ Penalver had reached an RFC determination for Cortes that was consistent with Dr. Lorber's testimony and with the medical opinion evidence he failed to weigh, it is clear that an illiterate individual like Cortes could not perform any job identified by the vocational expert.  Thus, the ALJ did not meet his burden at step five.

### D.    <u>Cortes Is Entitled To Remand For The Calculation Of Benefits</u>

"Remand [for further proceedings] is warranted where "'there are gaps in the administrative records or the ALJ has applied an improper legal standard.'"  <u>Cherico</u> v. <u>Colvin</u>, 12 Civ. 5734, 2014 WL 3939036 at *31 (S.D.N.Y. Aug.7, 2014) (quoting <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 82-83 (2d Cir. 1999)); <u>see</u>, <u>e.g.</u>, <u>Mariani</u> v. <u>Colvin</u>, 567 F. App'x 8, 11 (2d Cir. 2014) (remand

for further proceedings appropriate because "[f]urther findings would 'plainly help to assure the proper disposition' of [the plaintiff's] claim"); Selian v. Astrue, 708 F.3d 409, 422 (2d Cir. 2013) (remand for further proceedings; ALJ erred by not determining whether plaintiff's reaching limitation precluded reliance on the medical-vocational guidelines and by not obtaining vocational expert testimony if it did).[20]   "Remand is also appropriate where further findings or explanations will clarify the rationale for the ALJ's decision." Cherico v. Colvin,  2014 WL 3939036 at *31.[21]

Remand solely for the calculation of benefits is proper where further evidentiary proceedings would serve no purpose in light of persuasive proof of the plaintiff's disability. See, e.g., Butts v. Barnhart, 388 F.3d at 385-86 ("'[W]here this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.'"); Cahill v. Colvin, 12 Civ. 9445, 2014 WL 7392895 at *13 (S.D.N.Y. Dec. 29, 2014) ("The Second Circuit has consistently emphasized the importance of the Commissioner's burden to support her step-five determination with substantial evidence, and has held that a direct reversal with a remand only to calculate damages is warranted when the ALJ has failed to meet that burden") (collecting cases); Cherico v. Colvin, 2014 WL 3939036 at *31 ("If,

---

[20]   See also, e.g., Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004); Cataneo v. Astrue, No. 11-CV-2671, 2013 WL 1122626 at *23 (E.D.N.Y. Mar. 17, 2013); Melendez v. Astrue, 08 Civ. 6374, 2010 WL 199266 at *1 (S.D.N.Y. Jan. 20, 2010) ("Remand for further proceedings is the usual remedy when the record is incomplete or the ALJ has committed a legal error.").

[21]   See also, e.g., Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) ("[W]here we are 'unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' we will not 'hesitate to remand for further findings or a clearer explanation for the decision.'"); Naumovski v. Colvin, No. 12-CV-80, 2014 WL 4418101 at *9 (W.D.N.Y. Sept. 8, 2014); Baron v. Astrue, 11 Civ. 4262, 2013 WL 1245455 at *32 (S.D.N.Y. Mar. 4, 2013) ("Remand is also appropriate where further findings or explanations will clarify the rationale for the ALJ's decision."), report & rec. adopted, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013).

however, the record provides 'persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose,' the court may reverse and remand solely for the calculation and payment of benefits." (quoting Parker v. Harris, 626 F. 2d 225, 235 (2d Cir. 1980)); Sanchez v. Astrue, 07 Civ. 9318, 2010 WL 101501 at *11 (S.D.N.Y. Jan. 12, 2010) ("[A] court can also reverse and remand solely for the calculation of benefits when 'substantial evidence on the record as a whole indicates that the Claimant is disabled and entitled to benefits.'" (quoting Bush v. Shalala, 94 F.3d 40, 46 (2d Cir. 1996)).[22/]

As discussed above, the Commissioner concedes to having failed to meet her step five burden to produce evidence showing the existence of substantial gainful work in the economy that Cortes could perform.  (See pages 13, 23 above.)  Under the RFC that ALJ Penalver found for Cortes, the vocational expert did not identify a single occupation that an illiterate hypothetical individual similar to Cortes could actually perform.  (See pages 8-10 above.)[23/]  There is no reason to believe that a new, more limited RFC would lead to vocational expert testimony identifying additional potential occupations for Cortes.

The Commissioner argues that Cortes has not presented persuasive proof of his disability because the record allegedly contains evidence that Cortes could perform sedentary work.

---

[22/]   See also, e.g., Rhone v. Colvin, 13 Civ. 5766, 2015 WL 920942 at *14 (S.D.N.Y. Jan. 16, 2015); Ellis v. Colvin, 29 F. Supp. 3d 288, 302 (W.D.N.Y. June 30, 2014); Marmer v. Colvin, No. 10-CV-2787, 2014 WL 1365471 at *6 (E.D.N.Y. Apr. 7, 2014); Orr v. Barnhart, 375 F. Supp. 2d 193, 201-02 (W.D.N.Y. 2005) (remanding solely for calculation of benefits; further administrative proceedings would serve no useful purpose because the record was fully developed and contained substantial evidence that the plaintiff was disabled).

[23/]   Moreover, although ALJ Penalver also erred in determining Cortes' RFC and credibility at step three, the Commissioner's own arguments make clear that those errors point towards an RFC with, if anything, greater limitations than ALJ Penalver found.  (See pages 13, 18-19, 19 n.17 above.)

(Dkt. No. 22: Gov't Br. at 6-7.)[24/]   The Commissioner's argument is unpersuasive.  Individuals who have lost the use of an upper extremity "would generally not be expected to perform sedentary work because most unskilled sedentary jobs require good use of both hands." SSR 83-12, 1983 WL 31253 at *4; see also SSR 83-14, 1983 WL 31254 at *2 ("[S]ection 201.00(h) of Appendix 2 calls attention to the fact that bilateral manual dexterity is necessary for the performance of substantially all unskilled sedentary positions.").   The administrative record is replete with medical evidence that Cortes has lost the use of his left upper extremity.  In June 2002, a physician was unable even to examine Cortes' left arm because of his extreme pain.  (See page 4 above.)  In August and September 2002, Dr. Cole found that Cortes had extremely limited range of motion in his left arm and reduced strength due to severe pain.  (See page 4 above.)  A June 2004 examination found global weakness in Cortes' left shoulder and fingers, as well as contraction of his elbow and fingers on his left side.  (See page 5 above.)  Dr. Mathew noted that Cortes had not used his left arm in over a year and "holds his arm in a very guarded manner with his right arm."  (See page 5 above.)  Although his examination postdates the period at issue,  Dr. Szerenesy found that Cortes could not use his left hand, fingers and arm for grasping, twisting, and turning of objects, fine manipulation, or reaching.  (See page 8 above.)  Finally, the Commissioner's own medical expert, Dr. Lorber, testified that Cortes could perform no reaching whatsoever with his left arm.  (See page 8 above.)

---

[24/]      According to the Commissioner, MRIs of Cortes' cervical and thoracic spine "showed no cord abnormalities, stenosis, fracture, acute compression deformity, or any other spinal abnormalities" (Gov't Br. at 7), and Dr. Mathew's examination found Cortes' x-rays normal, his range of motion normal for all joints other than his left shoulder, and his left arm strength almost full (Gov't Br. 7-8).  The Commissioner also points to Dr. Szerenesy's opinion that Cortes could sit for at least six hours in an eight hour workday and sit for up to two hours at a time before needing to get up. (Gov't Br. at 8.)  Finally, the Commissioner notes that in Cortes' submissions to the ALJ, he related being able to perform personal care activities, drive a car, do laundry and participate in church.  (Id.)

Moreover, ALJ Penalver discussed with vocational expert Cestar the regulations' requirements for bilateral use of the hands in sedentary jobs.  (See page 9 above.)  Cestar agreed that sedentary work requires the use of both hands before testifying that the potential jobs he could cite for a hypothetical individual similar to Cortes and limited to light work also would require reaching in front of the body.  (See page 9 above.)  Significantly, the definition of light work encompasses the ability to do sedentary work.  20 C.F.R., Pt. 404, Subpt. P, App. 2 § 202.00(a) ("The functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work.").   The only light or sedentary occupations identified by Cestar that an individual like Cortes potentially could perform with the RFC found by ALJ Penalver were school bus monitor or cafeteria attendant, photocopying machine operator and laundry folder.  (See pages 8-10 above).  Because Cortes is illiterate, however, he does not meet the requirements for any of these occupations.  (See pages 23-24 above.)  Thus, the Commissioner has failed to present any evidence that there are light or sedentary jobs in the national economy that Cortes could perform. The Court is persuaded that further evidentiary proceedings would serve no purpose in light of the evidence of Cortes' disability, especially where there already have been several prior remands for further proceedings.

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that Cortes was not disabled within the meaning of the Social Security Act is not supported by substantial evidence. Cortes' motion for judgment on the pleadings (Dkt. No. 9) is GRANTED and the case is remanded for the calculation of benefits.

29

The Commissioner's motion for judgment on the pleadings (Dkt. No. 21) is <u>DENIED</u>.  The Clerk

of Court shall close the case.

SO ORDERED.

Dated:        New York, New York
              May 11, 2015


_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:        All Counsel